# Third District Court of Appeal

## State of Florida

Opinion filed October 12, 2022.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D21-53
Lower Tribunal No. 18-22242
_____

**Avant Design Group, Inc., etc.,**
Appellant/Cross-Appellee,

vs.

**Aquastar Holdings LLC, etc.,**
Appellee/Cross-Appellant.

An Appeal from the Circuit Court for Miami-Dade County, Abby Cynamon and Charles Johnson, Judges.

Peckar & Abramson, P.C., and Adam P. Handfinger, Freddy X. Muñoz and Anne-Solenne Rolland, for appellant/cross-appellee.

The Law Offices of Kristin Vivo, and Kristin Vivo (Singer Island); Osherow, PLLC, and Mark R. Osherow (Boca Raton), for appellee/cross-appellant.

Before SCALES, HENDON and GORDO, JJ.

SCALES, J.

Appellee/cross-appellant Aquastar Holdings, LLC ("Aquastar") purchased a condominium unit in a building in Surfside, Florida. Aquastar hired appellant/cross-appellee Avant Design Group, Inc. ("Avant") to administer the build-out of the unit. Toward the end of the project, Aquastar, concerned about the integrity of Avant's billings, terminated its contract with Avant. Each party sued the other on multiple bases and Aquastar also sued the three owners of Avant individually. In a detailed final judgment,[1] the trial court found in favor of Aquastar in its suit against Avant but declined to hold Avant's three owners individually liable for Aquastar's claims. Both parties appealed the Amended Final Judgment and Aquastar also appealed the trial court's April 14, 2021 order denying its Florida Rule of Civil Procedure 1.530 rehearing motion. For the reasons that follow, we affirm in part, reverse in part, and remand with instructions.

**I. Relevant Facts and Procedural History**

A. <u>The Contract</u>

Aquastar is owned by Wilson De Lara, a Brazilian businessman. Aquastar used Brazilian architect Debora Aguiar to design the interior of the

---

[1] During the pendency of the appeal, this Court relinquished jurisdiction to the trial court to correct the final judgment. On October 21, 2021, a successor judge entered a Final Judgment After Non-Jury Trial, *nunc pro tunc* to December 7, 2020 (the "Amended Final Judgment").

2

unit. Because Aguiar is not licensed in the United States, she recommended Avant both to oversee the project's construction and to obtain goods and services for the interior build-out. Aquastar purchased the unit and hired Avant in September 2016.

Aquastar and Avant entered into a contract known as "Proposal 27." Proposal 27 provided a schedule of construction items along with their anticipated costs. Although the trial court focused its attention on Proposal 27 for its analysis of the terms and conditions to which the parties had agreed, the parties executed a total of ninety-two such proposals, each of which was on a form generated by Avant. These other proposals described the furnishings, goods and services to be purchased for each of the rooms in the unit. Proposal 27 and the additional proposals all followed the same format, and all contained the same contractual language. The proposals provided that Aquastar would pay the cost of the goods and services of the vendors, plus pay a "20% Interior Design & Administrative Fee" to Avant (the "20% Fee").[2] The proposals contained no other contractual language regarding the amount or calculation of payment.

---

[2] Other than item descriptions and related pricing, the only other contractual language in Proposal 27 reads as follows:

> The preliminary budget of the Client's construction costs include [sic] anticipated costs for construction materials, labor and sales

B. Avant's Billings

For approximately eighteen months, the parties mutually performed under the proposals. Avant dealt with Aquastar's architect, and with contractors, subcontractors and vendors; presented Aquastar with vendor proposals, which Aquastar either accepted or rejected; oversaw the delivery and installation of furnishings, many of which were custom-made; served as a liaison with the condominium association; and provided written updates to Aquastar and its architect.

Monica Souza, Avant's Vice President, testified that Avant typically provides three types of work on a project like this one and charges separately for each distinct service: design services, construction administration services, and sales of construction materials and vendor products to be installed in the condominium unit. In this instance, because Aquastar had its own architect, Avant did not charge for design services. According to Souza,

tax. Any other cost, including not limited to, freight, cartage, shipping, receiving, storage and delivery are not included in the preliminary budget and will be invoiced separately. All items, materials or supplies are custom and are non-cancelable, non-returnable, non-refundable. [Avant] does not guarantee fitness or merchantability of any items, materials or supplies and does not warranty or guarantee for any functionality, use, damage, defect, wear or fading, any items, materials, or supplies, purchased for Client's Project, including but not limited to appliances, fixtures, fabrics and flooring items.

4

Avant did charge Aquastar both its 20% Fee and a profit mark-up for certain materials and services. Monica Souza testified that Avant's determination whether to add a profit mark-up to a service, a vendor's product or a product that Avant itself supplied was not a fixed decision but depended upon the "complexity" involved in Avant's ability to deliver the specific order.

By March 2018, as the project was nearing completion, Aquastar became concerned about mounting costs and requested that Avant provide Aquastar with copies of all vendor and contractor invoices reflecting wholesale costs of services and materials. Avant declined this request. Unable to verify actual vendor and contractor costs, Aquastar, on April 27, 2018, terminated the contract with Avant. At that point, Avant's records showed it had billed Aquastar a total of $1,208,899.87. These billings comprised all construction costs and all costs of vendor goods and services, plus Avant's 20% Fee and profit mark-ups. As of the date Aquastar terminated the contract, Aquastar believed it had paid Avant $1,117,890.78.[3] Thus, according to Avant, Aquastar's balance due at termination was $91,009.21. After Avant, on advice of counsel, made adjustments to this balance due, Avant, in May 2018, recorded a construction lien against the subject property in the amount of $66,909.21.

---

[3] At trial this amount was adjusted to $1,117,250.63.

C. The Dueling Complaints

In June 2018, Avant sued Aquastar. Avant's operative amended complaint, filed in April 2019, contains four counts: breach of oral contract, open account, unjust enrichment, and foreclosure of its construction lien. Essentially, Avant sued Aquaster for the balance due, though it is not clear from Avant's amended complaint whether Avant was seeking $91,009.12 or $66,909.21.

A month after Avant filed its initial complaint, Aquastar sued Avant and Avant's three owners individually (along with additional defendants who are not part of this appeal). Aquastar asserted against Avant counts for breach of contract, fraud in the inducement, breach of an implied covenant of good faith and fair dealing, conversion, fraudulent lien,[4] violation of Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), and unjust enrichment; and, as against the individual owners of Avant in their individual capacities, counts for fraud in the inducement, conversion, FDUTPA violation, unjust enrichment, and fraud.[5] In its complaint, Aquastar alleged that Avant had

---

[4] While Aquastar's fraudulent lien count asserted a claim for punitive damages, see § 713.31(2)(c) (2018), Aquastar did not comply with the procedural requirements of section 768.72 of the Florida Statutes.

[5] In the Amended Final Judgment, the trial court ruled against Aquastar on its claims for fraud in the inducement, conversion and unjust enrichment. Aquastar did not appeal these rulings.

6

overcharged Aquastar by (i) adding a profit mark-up to certain vendor goods and services over and above the 20% Fee that Aquastar asserted was inclusive of all profit, (ii) overbilling actual costs, and (iii) failing to complete billed work.

The trial court consolidated the cases and, with the consent of the parties, treated Aquastar's complaint as a counterclaim.

D. Avant's Accounting Procedures

During the discovery phase of the litigation, Avant disclosed that it used a software program called Designer Logic for its project recordkeeping. Designer Logic, though, is a construction management program, not an accounting program. After Aquastar filed a motion to compel Avant to produce its QuickBooks ledgers, the trial court, on October 8, 2019, entered an order compelling Avant to provide Aquastar with access to all QuickBooks data pertaining to the Aquastar project. QuickBooks, unlike Designer Logic, has an audit trail feature that would give Aquastar a clearer picture of the history of Avant's project invoices. Aquastar's expert witness, Dana Kaufman, reviewed Avant's Quickbooks entries, and Kaufman's subsequent testimony at trial provided the principal support for the trial court's rulings favorable to Aquastar.

E. The Trial

The trial court conducted a six-day, non-jury trial in June 2020. The principal issue for the trial court's adjudication was whether the parties' contract was, as Aquastar asserted, a cost-plus contract[6] or, as Avant argued, a fixed-price contract.[7] This threshold contract interpretation issue was intertwined with several factual issues arising from Aquastar's allegations about Avant's billing practices and accounting irregularities. Each party presented an accounting expert witness. The trial court found Kaufman's testimony to be the more persuasive. In addition to testifying that Avant was not entitled to a profit mark-up on top of the 20% Fee, Kaufman also testified, based on his review of Avant's QuickBooks ledger, that Avant had: (i) fabricated documents; (ii) backdated checks; (iii) greatly overcharged for the purchase of the unit's tile, then received money back from the tile supplier; (iv) billed Aquastar for a purchase of goods intended for a different

---

[6] As it argues on appeal, Aquastar asserted below that, pursuant to the proposals' payment provision, it was obligated to pay Avant only for vendor services provided for, and materials incorporated into, the project, plus the 20% Fee, i.e., a "cost-plus" contract.

[7] As it argues on appeal, Avant asserted below that Aquastar was required to pay Avant's invoices as they were submitted, and that Avant dynamically priced materials and services it acquired for the project based on the complexity of the item or service. Additionally, Avant asserted that, on those occasions when Aquastar acquired an item or service from a vendor not selected by Avant, Avant was entitled to – and invoiced Aquastar for – the 20% Fee on that item. Avant characterized this invoice-based arrangement as its "fixed fee" contract.

Avant customer; and (v) entered charges into QuickBooks for which there were no corresponding purchase orders.

F. <u>The Amended Final Judgment</u>

In the detailed Amended Final Judgment, the trial court ruled primarily in favor of Aquastar and against Avant. The trial court entered judgment in favor of Aquastar on all four counts of Avant's complaint and most of Aquastar's counterclaim.[8] The trial court determined that the parties' contract was a cost-plus contract. Additionally, based on Kaufman's testimony, the trial court found that Avant not only breached the contract but acted in a fraudulent manner; that Avant's $66,909.21 construction lien was fraudulent under section 713.31;[9] and that Avant's refusal to provide Aquastar with information about vendor costs was itself a deceptive practice prohibited by FDUTPA. The Amended Final Judgment's damage award of $525,608.50

---

[8] Aquastar prevailed on Avant's breach of contract, open account, unjust enrichment, and lien foreclosure counts. Aquastar also prevailed on its own breach of contract, breach of implied covenant of good faith and fair dealing, and fraudulent lien counts, as well as its unpled fraud count against Avant (see section II.C., *supra*). As described in more detail in section II.D., *supra,* the Amended Final Judgment is internally inconsistent as to whether Aquastar prevailed on its FDUTPA claim against Avant.

[9] Notwithstanding the trial court's determination that Avant's construction lien was fraudulent, the Amended Final Judgment did not discharge the lien (see section II, G. 2., *infra*).

for Aquastar, though, does not identify any separate and distinct damages occasioned by what the trial court characterized as Avant's fraud, FDUTPA violation, or violation of the implied covenant of good faith and fair dealing.

In the Amended Final Judgment, the trial court ruled in favor of Avant's three owners whom Aquastar sought to hold personally liable for fraud in the inducement, conversion, unjust enrichment, and fraud; and declined to pierce the corporate veil to find them liable on Avant's FDUTPA violation.

Avant timely appealed the Amended Final Judgment and Aquastar cross-appealed.

**II. Analysis**

A. Introduction

Avant challenges five rulings contained in the Amended Final Judgment that found Avant had (i) breached its contract with Aquastar, (ii) committed fraud, (iii) committed a FDUTPA violation, (iv) breached an implied covenant of good faith and fair dealing, and (v) filed a fraudulent construction lien. Avant also challenges the trial court's damages calculation. Aquastar cross-appeals several rulings contained in the Amended Final Judgment: (i) that the three individual defendants bear no personal liability for Avant's fraud and for Avant's FDUTPA violation; (ii) that the trial court

erred by not discharging the fraudulent construction lien; and (iii) several trial court findings involving attorney's fees, costs, and punitive damages.

B. Breach of Contract

1. *The Contract's Payment Terms*

At the threshold, we address Avant's principal argument that the trial court erred by finding that the parties had entered into a cost-plus contract. While the trial court did not make a specific finding that the parties' contract was ambiguous, the trial court, nevertheless, heard testimony from both parties' experts regarding the parties' contractual relationship, and, after weighing the testimony of the parties' competing experts, ultimately concluded there was no credible testimony to support Avant's position.[10]

---

[10] As noted, the trial court did not make a specific finding that the parties' contract was ambiguous. Generally, absent a finding of ambiguity, parol evidence is not admissible to assist the factfinder regarding the parties' intent. See Rivero v. Rivero, 963 So. 2d 934, 938 (Fla. 3d DCA 2007). Also, because questions of law are generally within the exclusive province of the trial court, an expert is normally not allowed to give opinion testimony on legal matters. See HSBC Bank USA, Nat'l Ass'n v. Buset, 241 So. 3d 882, 886 (Fla. 3d DCA 2018). In this case, though, both parties, without objection, elicited expert testimony regarding the nature of the parties' contract. Ordinarily, we would review *de novo* a trial court's contract interpretation. See Perez-Gurri Corp. v. McLeod, 238 So. 3d 347, 350 (Fla. 3d DCA 2017) (recognizing that the review of a trial court's contract interpretation is *de novo*.). Instead, we review the record to determine whether the trial court's finding in reliance on parol evidence is supported by competent, substantial evidence. Spancrete, Inc. v. Rinker Materials Corp., 623 So. 2d 760, 760 (Fla. 3d DCA 1993); Laufer v. Norma Fashions, Inc., 418 So. 2d 437, 439 (Fla. 3d DCA 1982).

Because the trial court and the parties treated the contract interpretation issue as a fact issue, we are compelled to affirm the trial court's factual findings unless the record is devoid of competent, substantial evidence supporting the trial court's findings. SG 2901, LLC v. Complimenti, Inc., 323 So. 3d 804, 806 (Fla. 3d DCA 2021). As ample record evidence supports the trial court's finding that the parties entered into a cost-plus contract that limited Aquastar's payment obligation to the 20% Fee, we affirm the trial court's principal conclusion regarding the contract's payment terms.

2. *Damages*

Avant next challenges the trial court's damages calculation. The trial court calculated Aquastar's damages by accepting the testimony of Aquastar's expert witness Dana Kaufman that the full cost of the build-out of Aquastar's condominium unit was $534,660.81. By adding Avant's 20% Fee plus applicable sales tax to this amount, the trial court arrived at a total project cost of $656,511.70. By deducting this amount from Aquastar's payment to Avant of $1,117,250.63, and including other damages to which Kaufman testified,[11] the trial court calculated Aquastar's damages at $525,608.50.

---

[11] This damages amount includes $40,091.87 that Aquastar paid another contractor to complete the project and $24,777.70 to reimburse Aquastar for work for which Avant charged Aquastar but failed to perform.

12

The trial court relied heavily upon the testimony of Kaufman, a certified public accountant and certified fraud examiner. Kaufman conducted an exhaustive review of Avant's financial records, including, significantly, Avant's QuickBooks ledger. His testimony provided a detailed description of how Avant overcharged Aquastar. Kaufman's testimony constituted competent, substantial evidence upon which the trial court was entitled to rely. See Coconut Grove Acquisition, LLC v. S & C Venture, 240 So. 3d 92, 95 (Fla. 3d DCA 2018). Because the trial court's breach-of-contract damage findings are supported by competent, substantial evidence, we are compelled to affirm the Amended Final Judgment in this regard. See SG 2901, LLC, 323 So. 3d at 806; Mars Int'l Corp. v. Pan Am. Trading Corp., 561 So. 2d 13, 13 (Fla. 3d DCA 1990) ("This court will not disturb the trial court's findings and conclusions where such findings and conclusions are based upon competent substantial evidence."); Pearce & Pearce, Inc. v. Kroh Bros. Dev. Co., 474 So. 2d 369, 371 (Fla. 1st DCA 1985) ("The general rule is that the extent of damages determined by a trial court is a question of fact which will be affirmed on appeal if supported by competent, substantial evidence.").

C. Fraud

Citing to this Court's opinion in Peebles v. Puig, 223 So. 3d 1065, 1068 (Fla. 3d DCA 2017), Avant also challenges the trial court's determination that it is liable to Aquastar in the amount of $525,608.50 (the same amount that the trial court awarded to Aquastar for Avant's breach of contract) for Avant's fraud.[12] In Peebles, the contracting parties consented to the entry of a judgment for breach of contract damages against Peebles's corporate employer. The case went to trial against Peebles on Puig's fraud claim in which Puig alleged that she had been duped into entering and performing the breached contract based on Peebles's fraudulent misrepresentations. Id. at 1067. Puig prevailed at trial, with the jury awarding Puig the exact same damages that had been awarded against and occasioned by Peebles's corporate employer's breach of contract. Id. at 1068. We reversed the fraud judgment against Peebles, concluding that, irrespective of what may have been Peebles's fraudulent conduct, "Florida does not allow a party damaged by a breach of contract to recover the exact same contract damages via a fraud claim." Id. at 1069; see Ghodrati v. Miami Paneling Corp., 770 So. 2d

---

[12] Avant also asserts that the trial court erred in finding Avant liable for Aquastar's fraud claim because only the three individual defendants, and not Avant, were named in Aquastar's fraud count. Aquastar counters that its fraud claim against Avant was tried by consent. Because of our reversal of the fraud award against Avant on other grounds, we need not, and therefore do not, reach this argument.

181, 183 (Fla. 3d DCA 2000) ("A plaintiff . . . may not recover damages for fraud that duplicate damages awarded for breach of contract.").

While we do not blithely disregard Kaufman's evidence that, post-litigation, Avant made bookkeeping alterations to justify overcharges, the crux of this case is – and Aquastar's damages are occasioned by – Avant's breach of its contractual arrangement with Aquastar. Aquastar presented no evidence of, and the trial court awarded no damages that were separate and distinct from, those damages it suffered as a result of Avant's breach of contract. We therefore reverse the Amended Final Judgment's award of damages for fraud against Avant. <u>Peebles</u>, 223 So. 3d at 1069.

D. <u>The FDUTPA Claim</u>

Avant next challenges what appears to be the trial court's determination in the Amended Final Judgment that Avant is liable to Aquastar in an indeterminate amount for Avant's violation of Florida's Deceptive and Unfair Trade Practices Act. <u>See</u> § 501.201 *et seq*., Fla. Stat. (2018).[13] The problems with the Amended Final Judgment with regard to Aquastar's FDUTPA claim are twofold: (i) the Amended Final Judgment is internally inconsistent as to whether a FDUTPA violation occurred; and (ii)

---

[13] Aquastar's FDUTPA claim was also brought against Monica Souza, Cristina Souza and Sonia Sun Yee Mak. See section II, F., *infra*.

15

the Amended Final Judgment does not quantify Aquastar's "actual damages" occasioned by any FDUTPA violation.

As for the internal inconsistency, in the body of the Amended Final Judgment, the trial court seems to find that a FDUTPA violation occurred when Avant refused to disclose its vendor wholesale prices to Aquastar, allegedly as a part of the scheme to overcharge Aquastar. Yet, in the portion of the Amended Final Judgment that purports to adjudicate the parties' various claims, the Amended Final Judgment reads: "9. The Court enters judgment in favor of Avant . . . on Count XI of Aquastar's Counterclaim [alleging a FDUTPA violation]." These contrasting holdings are not reconcilable.

Equally, if not more problematic, is that, to the extent it was the trial court's intention to enter judgment against Avant on Aquastar's FDUTPA claim, the Amended Final Judgment does not adjudicate any "actual damages" occasioned by Avant's alleged FDUTPA violation. Aquastar's FDUTPA claim against Avant is a statutory cause of action premised on section 501.211(2). This statute reads, in relevant part, as follows: "In any action brought by a person *who has suffered a loss as a result of a violation of this part*, such person may recover *actual damages*, plus attorney's fees

16

and court costs as provided in s. 501.2105." (Emphasis added.)[14] Despite such "actual damages" being an essential element of a FDUTPA claim brought pursuant to section 501.211(2), nowhere in the Amended Final Judgment does the trial court make a finding of any "actual damages" Aquastar suffered as a result of Avant's alleged FDUTPA violation.

Because Aquastar, as the proponent of this FDUTPA claim, bore the burden of proof on the claim, we conclude that it was incumbent upon Aquastar to seek the appropriate post-judgment relief under rule 1.530 or otherwise to assure that the judgment entered on its FDUTPA claim accurately reflected the trial court's rulings and contained the appropriate findings. While Aquastar did file a rule 1.530 motion directed toward other alleged errors and omissions of the Amended Final Judgment, and Aquastar has cross-appealed the trial court's denial of its rehearing motion, Aquastar's rehearing motion did not seek to correct or clarify the issues we have identified with regard to its FDUTPA claim against Avant, nor has Aquastar cross-appealed the Amended Final Judgment in this regard. Therefore, we

[14] Section 501.211(1) provides for a statutory declaratory judgment, wherein a party may seek a declaration from a court that a particular activity or conduct is violative of FDUTPA. Aquastar's counterclaim did not seek declaratory relief under section 501.211(1) but sought only damages under subsection (2).

reverse the Amended Final Judgment to the extent that it purported to enter judgment against Avant on Aquastar's FDUTPA claim.

E. Implied Covenant of Good Faith and Fair Dealing

Avant also appeals the trial court's finding that, by charging Aquastar in excess of the 20% Fee, Avant breached the contract's implied covenant of good faith and fair dealing. Every Florida contract contains an implied covenant of good faith and fair dealing that protects parties' reasonable expectations of honest conduct in their contractual obligations. Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc., 785 So. 2d 1232, 1234 (Fla. 4th DCA 2001).

The implied covenant, though, only "comes into play 'when a question is not resolved by the terms of the contract or when one party has the power to make a discretionary decision without defined standards.'" Speedway SuperAmerica, LLC v. Tropic Enters., Inc., 966 So. 2d 1, 3 (Fla. 2d DCA 2007) (quoting Publix Super Markets, Inc. v. Wilder Corp. of Del., 876 So. 2d 652, 654 (Fla. 2d DCA 2004)); see Cox v. CSX Intermodal, Inc., 732 So. 2d 1092, 1097-98 (Fla. 1st DCA 1999) ("[W]here the terms of the contract afford a party substantial discretion to promote the party's self-interest, the duty to act in good faith nevertheless limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party."). The

18

parties' dispute centers on and is resolved by the meaning of the 20% Fee provision of the contract. When the trial court determined that, pursuant to the parties' contract, Aquastar's payment obligations were specifically defined and limited so that Aquastar was liable to Avant only for vendor services provided for, and materials incorporated into, the project, plus the 20% Fee, any discretion retained by Avant in its billing was far too limited to implicate the covenant of good faith and fair dealing. Indeed, the 20% Fee locked in Aquastar's contractual payment obligation and afforded Avant no discretion to charge Aquastar in excess of the 20% Fee.

Accordingly, in this case, the trial court's factual findings specifically defining and limiting Aquastar's contractual payment obligations were inconsistent with its finding that Avant breached the implied covenant of good faith and fair dealing. We therefore reverse this part of the Amended Final Judgment.[15] Our reversal on this point, though, is not outcome-determinative as to damages because the trial court did not assign an amount of damages to Avant's alleged breach of the implied covenant.

F. <u>Liability of Individual Defendants</u>

---

[15] Nothing herein should be construed to mean that the implied covenant of good faith and fair dealing can never be implicated in a cost-plus contract. There certainly can be cost-plus contractual arrangements that contain the requisite discretion that would implicate the covenant. As per the trial court's specific findings, though, these parties did not have such an arrangement.

In its cross-appeal, Aquastar challenges those portions of the Amended Final Judgment that found for the three individual defendants, the principals of Avant – Monica Souza, Cristina Souza and Sonia Sun Yee Mak. Aquastar's counterclaim sought to hold the individual defendants personally liable for their conduct. In entering judgment for the individual defendants on all of Aquastar's claims, the trial court found that the individuals had not engaged in any conduct that would render them personally liable for any of Aquastar's claims.

We affirm the trial court's entry of judgment for the individual defendants, as the trial court's findings are supported by competent, substantial evidence. See Miami-Dade Cnty. Expressway Auth. v. Elec. Transaction Consultants Corp., 300 So. 3d 291, 294 (Fla. 3d DCA 2020).

G. Avant's Construction Lien

After Aquastar terminated the contract, Avant recorded a construction lien against the condominium unit, claiming it was owed $66,909.21 for work performed on Aquastar's unit. Avant's amended complaint sought to foreclose on this lien, and, both as an affirmative defense to Avant's foreclosure claim and as a stand-alone claim in its counterclaim, Aquastar asserted the lien was fraudulent. Making extensive findings of fact – findings supported primarily by the testimony of Aquastar's expert – the trial court

20

determined that, under section 713.31 of the Florida Statutes,[16] Avant's construction lien was fraudulent: "The Court finds that based on these overcharges, the lien is either willfully exaggerated or at the very least, compiled with such willful or gross negligence so as to amount to a willful exaggeration." This conclusion in the Amended Final Judgment, and the trial court's subsequent order denying Aquastar's rule 1.530 rehearing motion, spurred both Avant and Aquastar to raise several issues in the appeal and cross-appeal.

1. *Fraudulent Lien*

Avant argues that its lien was not fraudulent as it was not the consequence of willful exaggeration or willful inclusion of work not performed, but rather, that it was the product of Avant's good faith belief that, pursuant to its contract with Aquastar, it was owed additional funds from

---

[16] In relevant part, this statute reads as follows:

> Any lien asserted under this part in which the lienor has willfully exaggerated the amount for which such lien is claimed or in which the lienor has willfully included a claim for work not performed upon or materials not furnished for the property upon which he or she seeks to impress such lien or in which the lienor has compiled his or her claim with such willful and gross negligence as to amount to a willful exaggeration shall be deemed a fraudulent lien.

§ 713.31(2)(a), Fla. Stat. (2018).

Aquastar. Avant argues that a good faith contract dispute does not convert a lien arising from non-payment under the contract into a fraudulent lien under section 713.31(2) and relies heavily upon <u>Vinci Development Co. v. Connell</u>, 509 So. 2d 1128, 1132 (Fla. 2d DCA 1987) ("A subsequent dispute between the parties as to the amount of compensation due according to the contract plan of compensation or even a dispute as to the method of compensation provided in the contract does not convert such a good faith dispute into a fraudulent lien as provided in section 713.31.").

While Avant correctly identifies the general legal proposition underpinning <u>Vinci Development</u>, a careful reading of <u>Vinci Development</u> reveals that its holding is inapplicable in this case. After conducting a bench trial on the lien issue, the <u>Vinci Development</u> trial court made a *specific factual finding* that the contractor's lien was "based upon a contract dispute of valid feelings on behalf of the plaintiff that he was entitled to it; a good-faith feeling he was entitled to." <u>Id.</u> In reversing the trial court's "reluctant" finding that the subject lien had been exaggerated, the <u>Vinci Development</u> court concluded that a factual finding that a lien is based upon a good faith contractual dispute cannot co-exist with the statutory factual findings necessary to establish that the lien is fraudulent: i.e., willful exaggeration or willful inclusion of work not performed. <u>Id.</u>

22

Unlike the trial court in <u>Vinci Development</u>, the trial court in this case never made a factual finding that the lien was the product of a good faith contractual dispute. By contrast, the trial court determined, based primarily on the testimony of Aquastar's expert, that Avant willfully overcharged Aquastar and, therefore, willfully exaggerated the amount of the lien. These findings are supported by competent, substantial evidence. <u>See</u> <u>Miami-Dade Cnty. Expressway Auth.</u>, 300 So. 3d at 294. Because "[i]t is inappropriate for this court to substitute its judgment for that of the trial court," we are compelled to affirm the trial court's determination in the Amended Final Judgment that Avant's lien was fraudulent. <u>Castiello v. Sweetwater Homes of Citrus, Inc.</u>, 843 So. 2d 1019, 1021 (Fla. 5th DCA 2003).

2. *Discharge of Lien*

In its cross-appeal, Aquastar maintains that the trial court erred by not discharging Avant's construction lien after the trial court found it to be fraudulent. Post-appeal, Aquastar filed a motion requesting the trial court to enter an order discharging the lien, but the trial court declined to adjudicate the motion because of its belief that the pendency of this appeal deprived it of jurisdiction to entertain the motion.

Upon a finding that a lien is fraudulent, section 713.31(2)(b) empowers the trial court to declare the lien unenforceable. On remand, the trial court

shall enter such a declaration. Additionally, irrespective of Aquastar's claim – and the trial court's finding – that Avant's lien was fraudulent, Avant did not prevail on its claim seeking to enforce its lien, thereby entitling Aquastar, pursuant to 713.29 Florida Statutes,[17] to those reasonable attorney fees Aquastar incurred defending against Avant's lien claim. On remand, the trial court shall conduct whatever proceedings the trial court deems appropriate to determine those reasonable attorney's fees to which Aquastar is entitled pursuant to section 713.29.

### H. Aquastar's Rule 1.530 Rehearing Motion

Shortly after the trial court entered its initial final judgment, Aquastar filed a Florida Rule of Civil Procedure 1.530 rehearing motion requesting, among other things, that (i) the trial court revisit its determinations that the individual defendants were not liable for the claims asserted in Aquastar's counterclaim, and (ii) consistent with the trial court's fraudulent lien determination, the trial court award Aquastar section 713.31(2)(c) prevailing party attorney's fees, costs and punitive damages. On April 14, 2021, the trial court entered an order denying Aquastar's rule 1.530 rehearing motion.

---

[17] This provision reads, in relevant part, as follows: "In any action brought to enforce a lien . . . under this part, the prevailing party is entitled to recover a reasonable fee for the services of her or his attorney for trial . . . in an amount to be determined by the court, which fee must be taxed as part of the prevailing party's costs. . . ." § 713.29, Fla. Stat. (2018).

We affirm, without further elaboration, those portions of the trial court's April 14, 2021 order denying Aquastar's request to revisit its findings that the individual defendants have no liability for Aquastar's claims (see section II.F., *supra*), and denying Aquastar's claim for punitive damages.

With regard to that portion of Aquastar's rehearing motion arguing that the trial court erred by not awarding it reasonable attorney's fees and costs pursuant to section 713.31(2)(c), to the extent that Aquastar seeks recovery of such fees that would not be duplicative of fees the trial court may award pursuant to section 713.29 (see section II.G.2., *supra*), on remand the trial court shall conduct whatever proceedings it deems necessary to determine whether, in light of the holdings contained in this opinion, Aquastar is the prevailing party on the significant issues in the case, and thus entitled to reasonable attorney's fees and costs pursuant to section 713.31(2)(c). See Newman v. Guerra, 208 So. 3d 314, 319 (Fla. 4th DCA 2017).

**III. Conclusion**

We affirm the trial court's determinations in the Amended Final Judgment that: (i) the parties entered into a cost-plus contract limiting Aquastar's payment obligations as set forth therein; (ii) Avant breached the parties' contract; and (iii) as a result, Aquastar is entitled to $525,608.50 in breach of contract damages from Avant. We also affirm the trial court's

25

determination in the Amended Final Judgment that Avant's construction lien was fraudulent, and remand to the trial court to: (i) enter an order discharging the lien; (ii) conduct those proceedings it deems necessary to determine those reasonable attorney's fees to which Aquastar is entitled under section 713.29; and (iii) to determine, in light of the holdings in this opinion, whether Aquastar is the substantially prevailing party entitled to reasonable fees and costs pursuant to section 713.31(2)(c), to the extent that these fees are not duplicative of section 713.29 fees.

We reverse the Amended Final Judgment to the extent that it concluded that Avant committed a FDUTPA violation. We also reverse those portions of the Amended Final Judgment insofar as it determines Avant is liable to Aquastar for fraud and breach of the covenant of good faith and fair dealing.

We affirm the trial court's findings that Avant's owners, Monica Souza, Cristina Souza and Sonia Sun Yee Mak, bear no individual personal liability to Aquastar and that Avant is not liable to Aquastar for punitive damages.

After conducting the proceedings on remand, the trial court shall enter a Revised Final Judgment that reflects the result of those proceedings and that is consistent with this opinion's holdings.

26

Affirmed in part, reversed in part, and remanded with instructions.